Samuel E. JENKINS, Plaintiff,

v.

Ronald J. ANGELONE,
et al., Defendants.

Civil Action No. 95–856–AM.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 4, 1996.

As Corrected Nov. 3, 1996.

Samuel E. Jenkins, Jarratt, VA, Pro Se.

Collin Jefferson Hite, Susan C. Alexander, Office of the Attorney General, Richmond, VA, Helen Fahey, United States Attorney, Eastern District of Virginia, United States Attorney's Office, Alexandria, VA, Carlotta P. Wells, Jonathan T. Foot, U.S. Department of Justice, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

Plaintiff, Samuel E. Jenkins, filed this § 1983 complaint alleging that his rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb and the First and Fourteenth Amendments were violated. In his complaint, plaintiff names the following defendants: Director Ronald J. Angelone ("Angelone"), Dietician V. Young ("Young"), Chief Warden John B. Jabe ("Jabe"), Deputy Warden J. Clark ("Clark"), Food Director J. Johnson ("Johnson"), A. Gillispe ("Gillispe"), Williamson, and Winfield. Plaintiff seeks monetary and injunctive relief.

In response, defendants Angelone, Young, Jabe, Clark, Johnson, and Gillispe filed a Motion for Summary Judgment and afforded plaintiff an opportunity to respond pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975). Plaintiff filed a responsive pleading and moved to dismiss defendants Williams and Whitfield from this action. This matter is now ready for adjudication.

### I

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to plaintiff, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir.1985). Although the court must draw all reasonable inferences in favor of the nonmoving party, plaintiff must establish a genuine dispute of fact based upon affidavits and other evidence. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, plaintiff, "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). For the reasons that follow, the Court finds that defendants are entitled to judgment as a matter of law and grants defendants' motion.

### II

Plaintiff is a practicing African Hebrew Israelite [1] ("Hebrew"). His religious beliefs require him to be on a Vegan diet, which consists of fresh fruit, vegetables (raw or cooked), legumes, herbs, spices and nuts. Consumption of "unnatural" ingredients and animal products, including any by-products, is strictly forbidden. The Hebrew religion celebrates four festivals, Passover, Festival of Weeks, Day of Atonement, and Feast of Tabernacle. In particular, Passover requires a special meal of horseradish, unleavened bread, and a sweet condiment made of apples, cinnamon or nutmeg, and honey. *See* Plaintiff's Complaint at page 2.

The Greensville Correctional Center's ("GCC") prison menu does not provide meals which meet the strict standard of a Vegan diet. However, at every meal, the GCC offers to the general prison population two vegetarian substitutes. Plaintiff asserts that the vegetarian substitutes are insufficient because the substitutes contain animal by-products such as eggs, milk, butter, and other unnatural ingredients. Plaintiff also alleges that since the Hebrew religion became established at the GCC in 1992, he has been denied special meals on Passover.

In addition, the GCC allows one hour per week for religious worship. Plaintiff contends that this amount of time is not enough

---

1. In 1992 the African Hebrew Israelite religion became an established religion at the Greensville Correctional Center. At this time, the African Hebrew Israelite Constitution of Beliefs was submitted to prison officials. *See* Plaintiff's Complaint at page 2.

to perform Hebrew ceremonies and other Hebrew activities.[2] Lastly, plaintiff asserts that the GCC provides religious benefits to other prisoners not of the Hebrew faith. Specifically, plaintiff claims that the GCC provides religious meals to other religious groups, the GCC accommodates Muslims with religious meals at special times for the holiday of Ramadan, the GCC provides Christians with religious food, such as bread and drinks, and the Virginia Department of Corrections ("VDOC") provides Jews with kosher meals.

On March 3, 1996, plaintiff wrote a letter to defendant Jabe stating that he was being denied his right to practice religion because he was not served meals in accordance with the Hebrew dietary laws. Plaintiff alleges that defendant Jabe's response to his complaint was that the GCC does not serve religious diets. Plaintiff also mailed a petition titled, "Petition from the Hebrew Israelite Brought Pursuant to the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb" to all of the named defendants in the instant case. Plaintiff alleges that defendants Jabe and Angelone response to the petition was that the GCC does not provide religious diets.[3]

From these facts, plaintiff alleges:

2. Plaintiff asserts that at the Hebrew religious group meetings, prisoners must be able to accomplish studying the Hebrew language, watching videos, listening to cassette tapes, discussing the Holy Torah and other religious books, planning Festival days, and educating new members. *See* Plaintiff's Complaint at page 3.

3. In addition, plaintiff claims he spoke with defendants Gillispe, Williams, and Whitfield about the concerns he had with the vegetarian substitutes. There is no record of defendants responses in plaintiff's complaint.

   Also, plaintiff alleges that on three separate occasions he discussed with defendant Clark that the prison meals did not meet the standards of a strict vegan diet. There is no record of defendants responses in plaintiff's complaint. *See* Plaintiff's Complaint at pages 2–3.

4. A person seeking relief under § 1983 must show that a person acting under color of state law deprived him of a constitutional right. In the instant case, defendants are "persons" in their individual capacity and acted under color of state law as employees of the Greensville Correctional Center, a state run facility.

1. Defendants violated plaintiff's First Amendment rights by (1) denying to serve plaintiff meals in accordance with the Hebrew dietary laws and (2) only providing one hour per week for religious worship.

2. Defendants violated the RFRA, 42 U.S.C. § 2000bb by (1) denying to serve plaintiff meals in accordance with the Hebrew dietary laws and (2) only providing one hour per week for religious worship.

3. Defendants violated plaintiff's equal protection rights under the Fourteenth Amendment by providing other religious groups special foods and items in accordance with their faith.

### III

In his § 1983 complaint, plaintiff raises both a constitutional claim under the First Amendment and a statutory claim under RFRA.[4] The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..."[5] Prisoners retain their First Amendment Right to freely worship while in prison, even though they have forfeited many of their other constitutional rights.[6] *See O'Lone v. Shabazz,* 482 U.S.

5. In order for plaintiff to receive protection from the First Amendment, he must first show that (1) he sincerely holds his religious beliefs and (2) his claims are rooted in a religious belief, not in "purely secular" concerns. *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 713–14, 101 S.Ct. 1425, 1429–30, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). For summary judgment purposes the Court will assume that plaintiff sincerely holds his religious beliefs and his claims are rooted in his religious beliefs.

6. In *O'Lone v. Shabazz,* the Supreme Court stated that "limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." 482 U.S. at 348, 107 S.Ct. at 2404 (citing *Pell,* 417 U.S. at 822–23, 94 S.Ct. at 2804; *Procunier v. Martinez,* 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974)).

342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (citation omitted); *Ali v. Dixon*, 912 F.2d 86, 88 (4th Cir.1990); *Dettmer v. Landon*, 799 F.2d 929, 933 (4th Cir.1986); *Sweet v. South Carolina Dep't of Corrections*, 529 F.2d 854, 858–60 (4th Cir.1975).

However, courts do not have the expertise to administer state prisons and therefore, should defer to prison official's administration on maintaining security and discipline within the prison. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404. In order to afford prison officials appropriate deference, the Supreme Court held that a prison regulation was, "valid if it is reasonably related to legitimate penological interests." [7] *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.

On November 16, 1993, the United States Congress passed RFRA, which states that the government can only substantially burden a person's exercise of religion if they are furthering a compelling government interest in the least restrictive means. 42 U.S.C. § 2000bb–1(a)–(b). The intent of RFRA, as applied to prisoners, was to "restore the traditional protections afforded to prisoners" prior to the Supreme Courts decision in *O'Lone v. Shabazz*. S.Rep. No. 111, 103rd Cong., 1st Sess. 9 (1993), U.S.Code Cong. & Admin.News 1993, pp. 1892, 1899.

There are two different parts to RFRA. First, plaintiff must show that the government substantially burdened his freedom to exercise his religion. A substantial burden exists "where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting

substantial pressure on an adherent to modify his behavior and to violate his beliefs ..." *Thomas*, 450 U.S. at 717–18, 101 S.Ct. at 1431–32. *See Goodall v. Stafford County Sch. Bd.*, 60 F.3d 168 (4th Cir.1995); *Battles v. Ann Arundel County Bd. of Educ.*, 904 F.Supp. 471 (D.Md.1995); *Kabir v. Evatt*, 876 F.Supp. 756 (D.S.C.1995).

■ In the instant case, plaintiff asserts he is unable to keep a Vegan diet in accordance with the dietary law of his religion. In addition, plaintiff claims that an hour of group worship is not enough time to fully complete the necessary activities prescribed by his religion. When these facts are construed in the light most favorable to plaintiff, the Court finds that they are sufficient to show that the government substantially burdened his freedom to exercise his religion.

The burden now shifts to the government to show that the constitutional infringement is furthering a compelling government interest in the least restrictive means. As quoted by the Senate's Judicial Report:

> While recognizing that the courts may not substitute their judgments for those of prison administrators in matters of prison procedure and management ... asserted justification of restrictions on religious practices ... must be shown to outweigh the inmates' First Amendment rights, and 'only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion.' [T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety ... [to establish] 'highest order.'

S.Rep. No. 111, 103rd Cong., 1st Sess. 109 (1993), U.S.Code Cong. & Admin.News 1993, p. 1899 (quoting *Weaver v. Jago*, 675 F.2d 116, 119 (6th Cir.1982)).

7. When assessing a prison regulation's reasonableness, the Supreme Court identified four factors to consider: (1) there must be a rational connection between the prison regulation and the legitimate governmental interest; (2) whether there are alternatives means remain open for the prisoner to exercise his right; (3) what impact the requested constitutional accommodation from the prisoner will have on guards, other prisoners, and the allocation of prison resources; and (4) whether the absence of alternatives is evidence of the reasonableness of a prison regulation. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62. *See Ali*, 912 F.2d at 88; *Lane v. Griffin*, 834 F.2d 403, 406 (4th Cir.1987).

## IV

The first claim plaintiff makes against defendants is that they refuse to serve plaintiff a strict Vegan diet in accordance with the Hebrew dietary laws. The Court finds that there is a compelling government interest applied in the least restrictive means.

Ms. Shears, a registered dietician and Health Services Dietician for VDOC, states in a sworn affidavit that a strict vegetarian or Vegan diet would cause nutritional problems in a prison setting. Specifically, inmates on such a diet would be prone to rickets, scurvy, and other conditions associated with malnutrition.[8] *See* Defendants' Motion for Summary Judgment, Exhibit II, Affidavit of Ms. L. Shear, at pages 1–2. Plaintiff has not supplied the Court with any evidence to the contrary and only makes general assertions that "vegetable items, fruits, nuts, etc. could supply the necessary [nutritional] requirements" without any supporting affidavits.[9] *See* Plaintiff's Response to Defendants' Motion for Summary Judgment at page 1.

The GCC does offer inmates a choice of two meat substitutes with each meal. To ensure inmates receive adequate nutrition, the meat substitutes include legumes, dairy products, and eggs, which are not present in a Vegan diet. *See* Defendants' Motion for Summary Judgment, Exhibit II, Affidavit of Ms. L. Shear, at pages 1–2. Defendant Johnson, Director of Food Services at GCC, states in a sworn affidavit that a standard meal has two vegetarian items. Outside vendors supply the vegetarian items and these items are monitored to ensure that no butter, eggs, or animal by-products are present in the food.[10] Furthermore, kitchen staff does not add anything to the vegetarian substitutes. *See* Defendants' Motion for Summary Judgment, Exhibit IV, Affidavit of Mr. J. Johnson, at pages 1–2. In plaintiff's complaint, he merely alleges that the vegetarian substitutes contain animal by-products but does not offer any supporting affidavits or other evidence. *See* Plaintiff's Complaint at pages 2–3. Also, in plaintiff's response to defendants' Motion, he admits vegetarian items are offered and does not refute Defendant Johnson's statements. *See* Plaintiff's Response to Defendants' Motion for Summary Judgment at page 1.

Lastly, Buckingham Correctional Center is the only facility that offers religious diets.[11] Mr. G. Johnson, Deputy Director of VDOC, states in a sworn affidavit that it would not be feasible to offer a Vegan diet at Buckingham because of health reasons [12], and security, administrative, and cost concerns. Because only fresh fruit and vegetables can be consumed on a Vegan diet, Buckingham would have to store significantly more fresh fruit and vegetables than are currently stored. The potential for inmates to make alcohol or mash would dramatically in-

---

8. Ms. Shear states that vital nutrients are lacking in a Vegan diet, such as vitamin B12, vitamin D, iron, calcium, riboflavin, and zinc. An inmate would have to take vitamin supplements, fortified soy products, or seaweed to receive adequate nutrition. The intake of these supplements would have to be monitored strictly by GCC. *See* Defendants' Motion for Summary Judgment, Exhibit II, Affidavit of Ms. L. Shear, at pages 1–2. Currently, GCC does not offer these supplements because they include non-traditional food items that are expensive and not readily available. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. Gene Johnson, at page 4.

9. Plaintiff asserts that the GCC should provide him with vitamin supplements so he could receive the nutritional requirements necessary while on a Vegan diet. However, according to Mr. Gene Johnson's experience as the Deputy Director of VDOC, "a large number of inmates probably would not take the responsibility for consuming the dietary supplements necessary to ensure proper nutrition." As a result, inmates' health would suffer, causing them to require medical treatment. This increase in medical treatment would increase the costs for medical staff, supplies, and medical care facilities. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. G. Johnson, at page 4.

10. If GCC discovers that any of the vegetarian substitutes have animal by-products, they immediately discontinue buying products from that vendor.

11. Buckingham provides two religious diets, the Jewish kosher diet and the Nation of Islam diet. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. G. Johnson, at page 1.

12. For discussion on health reasons, see supra at pages 8–9.

crease.[13] The increase in the production of alcohol/mash would result in a greater security threat to Buckingham. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. G. Johnson, at pages 5–6.

This increase in fresh fruit and vegetables, as well as other grains and non-traditional food items required by a Vegan diet, would also raise the overall cost for food services. For instance, additional time and staff would be needed to prepare the food and more space and supplies would be required to store the food. Also, an administrative cost would be incurred from the additional prisoner transfers to Buckingham.[14] *Id.*

### V

The second claim plaintiff alleges is that defendants have restricted his right to practice his religion freely by only providing one hour per week for religious worship. The Court finds that there is a compelling government interest applied in the least restrictive means.

Defendant Jabe, Chief Warden of GCC, in a sworn affidavit states that on or around September 19, 1994 the GCC was placed on lockdown status due to inmate disturbances. Lockdown status was necessary to bring the institution "back under control." As a result, special security measures were put into place and religious groups were permitted to meet once a week for an hour.[15] *See* Defendants' Motion for Summary Judgment, Exhibit I, Affidavit of Mr. John Jabe, at pages 2–4.

More specifically, defendant Jabe states that correctional officers are responsible for monitoring inmate movement during the religious groups, even though each religious group has a sponsor. With over 1500 inmates to accommodate in a maximum security correctional facility, all group meetings are limited "to maintain an accurate account of inmate movement and provide effective security techniques for the safety and control to the institution." *Id.* Furthermore, GCC inmates can practice their religion in their cell with their personal religious items that meet GCC's safety regulations and policies. *Id.*

### VI

In conclusion, defendants have met the onus of demonstrating that the impediments placed in the way of plaintiff's observance of his dietary creed and religious practices have a compelling justification. This compelling justification is based on defendants need to preserve the health of inmates, maintain security of the facility, manage budgetary constraints, and deflect administrative difficulties. *See Ross v. Blackledge*, 477 F.2d 616, 618 (4th Cir.1973). Furthermore, defendants have articulated more then mere conclusory statements that their failure to provide a Vegan diet and their restriction on religious group meetings are necessary for security, health, and administrative purposes.

Defendants have used the least restrictive means available by affording plaintiff an opportunity to choose two vegetarian substitutes at every meal and practice his religion in a group for two hours a week and individually in his cell. The Court finds that defendants have established that their interests are of the highest order and outweigh plaintiff's First Amendment rights. Therefore, plaintiff's claims under the First Amendment and RFRA must be dismissed.[16]

---

**13.** The VDOC serves canned vegetables and no sugar to minimize the raw materials available to make alcohol/mash. Inmates steal raw materials from kitchens, storage areas, and mess halls to make alcohol/mash in their cells. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. G. Johnson, at pages 5–6.

**14.** For GCC to transfer an inmate the following must take place: reviewing applications, designating special classifications, processing paper work, and moving the inmate to Buckingham. *See* Defendants' Motion for Summary Judgment, Exhibit III, Affidavit of Mr. G. Johnson, at pages 5–6.

**15.** Prior to lockdown, GCC allowed religious groups to meet several times during the week. However, during lockdown status inmates were on near total cell restriction and all inmate activities were suspended. Since August 1996, religious groups have been able to meet for two hours a week. *See* Defendants' Motion for Summary Judgment, Exhibit I, Affidavit of Mr. John Jabe, at pages 2–4.

**16.** Defendants challenged the constitutionality of RFRA. The Court will not address this issue because plaintiff failed to make a successful claim under RFRA.

## VII

◼ Plaintiff also claims that defendants violated his equal protection rights by providing other religious groups meals in accordance with their faith and special foods for their ceremonies. The Supreme Court's "reasonably related" standard stated in *Turner* applies to all prisoner cases in which constitutional rights have been violated. *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990). *See Shaheed v. Winston,* 885 F.Supp. 861, 868 (E.D.Va.1995). Before applying the *Turner* standard, the Court must first determine whether a constitutional violation has occurred. *Shaheed,* 885 F.Supp. at 868.

An equal protection claim arises when, without adequate justification, similarly situated persons are treated differently by a governmental entity. U.S. Const.Amend XIV. Plaintiff must show that a "discriminatory purpose was a motivating factor in the defendants' actions." *Shaheed,* at 868 (citing *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). In the instant case, plaintiff does not allege a single fact indicating that defendants are motivated by a discriminatory purpose. Therefore, plaintiff's equal protection claim must be dismissed.

## VIII

Based on the foregoing, the Court grants defendants' Motion for Summary Judgment and enters judgment in favor of all defendants. An appropriate Order shall issue.

---

Defendants also raised the defense of qualified immunity. The Court will reach the merits of this defense because plaintiff failed to make successful claim, therefore qualified immunity does not apply to the instant case.