In the

# United States Court of Appeals
### For the Seventh Circuit

————————

No. 05-1904

GREGORY KOGER,

*Plaintiff-Appellant,*

*v.*

WALTER L. BRYAN, DENNIS GUTH,
PEARLENE PITCHFORD, ET AL.,

*Defendants-Appellees.*

————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 1177—**Harold A. Baker**, *Judge.*

————————

ARGUED SEPTEMBER 26, 2007—DECIDED APRIL 24, 2008

————————

Before MANION, EVANS, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Gregory Koger ("Koger"), a former inmate at the Pontiac Correctional Center in Illinois, filed suit against six prison officials claiming they failed to accommodate his religious-based requests for a non-meat diet. Koger claimed that this failure to accommodate his dietary request was a violation of his rights as protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the First and Fourteenth Amendments of the Constitution. The defendants moved for summary judgment, arguing that Koger's

diet was not changed because his request did not meet the requirements necessary for prisoners seeking such an accommodation and that those requirements were lawful. The district court granted the defendants' motion as to all of Koger's claims, and Koger now appeals. We reverse the district court's grant of summary judgment on Koger's RLUIPA claim, and remand for further proceedings consistent with this opinion.

## I.

The facts material to this appeal are undisputed. Koger was remanded to the custody of the Illinois Department of Corrections ("IDOC") in 1996, and originally housed at the Joliet Correctional Center. Upon entering prison, Koger designated his religious affiliation as Baptist. In 1999, while housed at the Centralia Correctional Center, Koger changed his religious affiliation to Buddhist. Koger was not required to provide IDOC officials with any documentation in support of his original affiliation as a Baptist, or upon re-affiliating as a Buddhist. In September 2000, Koger was transferred to the Pontiac Correctional Center. A few months after this transfer, he stopped eating meat or anything on his meal tray that had touched meat. Koger adopted this diet to accommodate his yoga practices, but claimed that it subjected him to extreme hunger pains.

In May 2001, Koger contacted the prison's chaplain, Fr. Walter Bryan ("Bryan"), requesting that his religious affiliation be changed to reflect that he was no longer a Buddhist, and that he be provided with a non-meat diet as part of his religious practices. During the period in question, Pontiac served three religious diets—kosher, vegan,

and lacto-ovo vegetarian. The last two contain no meat, and would have satisfied Koger's request. Bryan responded with a letter stating that Koger's request would not be granted absent a letter from a "Rabbi-Imam, etc." of Koger's new religion. Koger replied to Bryan's letter saying that he was not a member of a formally established religion, and accordingly there was no clergy member available to contact Bryan on his behalf. Koger's letter further explained some of his religious beliefs, stating that his "yoga practices required a non-meat vegetarian diet." Bryan did not respond to this letter.

Koger began searching for a religion that fit his beliefs, and in November 2001, he joined Ordo Templi Orientis ("OTO"), a group associated with the religion of Thelema. Thelema was founded by Aleister Crowley in 1904, and has as its central tenet "Do what thou wilt," which its followers consider a divine mandate to discover their true purpose in life. In December 2001, Koger again wrote Bryan, requesting that his affiliation be changed from Buddhism to OTO, and that he be given a non-meat diet. Koger included with his request an informational letter from T. Allen Greenfield ("Greenfield"), OTO's Prison Ministry Coordinator, setting forth some of OTO's beliefs and practices.[1] Notably, Greenfield's letter stated that "Thelema imposes no general dietary restrictions; though each individual Thelemite may, from time to time, include dietary restrictions as part of his or her

---

[1] While the parties use "OTO" and "Thelema" interchangeably in the record, Greenfield's letter clarified that "[w]ithin the broad context of Thelema, O.T.O. functions as a fraternal, initiatory, social, and educational organization of a religious nature."

personal regimen of spiritual discipline." In response to this second request, Bryan again sent a letter indicating that Koger's affiliation and diet would not be changed without a letter from a "Rabbi-Imam, etc."

On January 13, 2002, Koger filed an IDOC Grievance based upon Bryan's failure to change his affiliation and diet. Upon review of the Grievance, Grievance Counselor and Defendant Dennis Guth ("Guth") responded stating that he had consulted with Bryan, who indicated that he needed a "letter" from the religious organization sent directly to him, and that "information" would not be considered. Guth's response was reviewed by Grievance Officer and Defendant Pearlene Pitchford ("Pitchford"), and on March 13, 2002, she filed a report finding that Guth's response adequately addressed Koger's concerns. In making this determination, Pitchford expressly noted the language from Greenfield's letter stating that Thelema imposes no general dietary restrictions. Defendant James Schomig ("Schomig"), Chief Administrative Officer and Warden of Pontiac Correctional Center, concurred with Pitchford's assessment. Koger subsequently appealed under the grievance process. On March 25, 2002, Administrative Review Board Member Douglas A. Cravens ("Cravens") and IDOC Director Donald N. Snyder ("Snyder") issued their finding that the decisions of Pitchford and Schomig appropriately addressed Koger's grievance.[2] Accordingly, they recommended that Koger's grievance be denied.

In April 2002, Koger received a copy of a letter Greenfield sent to Bryan indicating that Koger was an OTO

---

[2] We hereafter refer to Bryan, Guth, Pitchford, Schomig, Cravens, and Snyder collectively as the "prison officials."

parishioner, and discussing the organizational nature of OTO. Relying on this letter, as well as a letter from OTO's Treasurer stating that he was a dues-paying member of OTO, Koger filed a third request with Bryan asking that his affiliation be changed from Buddhism to OTO, and that he be provided a non-meat diet. On December 2, 2002, Assistant Warden Adella Jordan-Luster ("Jordan-Luster") sent Koger a response granting his request for affiliation change, but denying his request for a non-meat diet. Jordan-Luster indicated that this denial was based upon information she reviewed indicating that Thelema had no dietary requirements. There is no indication in the record that Koger made any further requests for an affiliation or diet change following this last exchange. Koger was released from the custody of IDOC on parole on December 11, 2006.

As this protracted correspondence proceeded, on May 1, 2002, Koger filed a pro-se complaint in the district court. In his initial complaint, Koger alleged violations of the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1. Snyder, Cravens, Guth, and Pitchford waived service of process. Bryan and Schomig were never served with process, nor did they waive it. After obtaining summonses from the district court, Koger filed motions on August 2, 2002, January 19, 2003, February 4, 2003, and June 23, 2004, pursuant to Federal Rule of Civil Procedure 4[3] re-

---

[3] "At the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a
(continued...)

questing that service of process be made by a United States marshal. In each of those instances, the district court denied Koger's motions finding that because Koger was not proceeding in forma pauperis, it was his responsibility to serve the defendants.

Koger was eventually given leave to file an Amended Complaint. In his amended complaint, filed October 9, 2003, Koger alleged that the prison officials' clergy verification requirement, and their failure to place him on a non-meat diet because OTO did not require one, violated the Establishment and Free Exercise Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, and RLUIPA, 42 U.S.C. § 2000cc-1(a). Koger sought declaratory and injunctive relief, as well as compensatory and punitive damages. On June 23, 2004, Koger filed a motion to compel better responses to interrogatories he propounded on the prison officials in an attempt to obtain discovery he believed would be helpful to his case. This motion was still pending on August 23, 2004, when Snyder, Cravens, Guth, and Pitchford filed a motion for summary judgment. Koger filed a response on September 1, 2004, arguing that the existence of genuine issues of material fact prohibited entry of summary judgment, or that the record established that he was entitled to summary judgment. Additionally, Koger cited Federal Rule

---

[3] (...continued)
person specially appointed by the court. The court must so order if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915 . . . ." Fed. R. Civ. P. 4(c)(3).

of Civil Procedure 56(f)[4] and stated that because he had outstanding discovery requests subject to a motion to compel, and involving information relevant to his claims, the motion for summary judgment should be denied or stayed until he had an opportunity to complete discovery. More than five months after Koger's response to the motion for summary judgment, the district court denied his motion to compel believing it to be moot because Koger had responded to the motion for summary judgment. The denial did not reference Koger's invocation of Rule 56(f).

The district court subsequently granted the motion for summary judgment. The court's ruling was based on its finding that the policy requiring Koger to verify his membership in OTO did not violate the First Amendment because it was reasonably related to a legitimate penological interest, and did not violate RLUIPA because the policy was the least restrictive means of furthering a compelling governmental interest. Additionally, the district court found that Koger could not support an equal protection claim because he had not introduced evidence showing that he suffered discrimination based upon his membership in any class. The district court entered summary judgment in favor of the prison officials on March 24, 2005. Koger now appeals, arguing that the prison officials' clergy verification requirement, as well

---

[4] "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).

as their failure to place him on a non-meat diet because OTO did not require one, violate RLUIPA and the First and Fourteenth Amendments of the Constitution. Koger further argues that the district court erred in ruling on the motion for summary judgment after denying his motion to compel as moot, and by denying his motions for service by the marshal.

## II.

We review the district court's grant of summary judgment de novo, examining the record in the light most favorable to Koger. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). As we noted above, the material facts are not in dispute, and we are therefore presented with the legal question of whether the prison officials' conduct accords with federal law. *Charles v. Verhagen*, 348 F.3d 601, 606 (7th Cir. 2003). RLUIPA prohibits prisons receiving federal funds[5] from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate "that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1) - (2). Unlike cases arising under the Free Exercise Clause of the First Amendment, this prohibition applies even where the burden on the prisoner "results from a rule of general applicability." 42 U.S.C. § 2000cc-1(a); *compare Cutter*, 544 U.S. at 732 (Thomas, J., concurring) (citing 42 U.S.C. § 2000cc-1(a) for the proposition

---

[5] "Every state . . . accepts federal funding for its prisons." *Cutter v. Wilkinson*, 544 U.S. 709, 716 n.4 (2005).

that RLUIPA applies to rules of general applicability), *with Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (noting that in the Free Exercise context "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"). In establishing a claim under RLUIPA, the plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion. 42 U.S.C. § 2000cc-2(b). Once the plaintiff establishes this prima facie case, the defendants "bear the burden of persuasion on any [other] element of the claim," *id.*, namely whether their practice "is the least restrictive means of furthering a compelling governmental interest." *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006). As noted above, Koger challenges two practices of the prison officials that he claims placed a substantial burden on his religious exercise. First, the prison officials expressly refused to provide Koger with a non-meat diet because such a diet was not required by OTO. Second, the prison officials required that an OTO clergy member submit to Bryan written verification of Koger's membership in OTO and its tenets. For ease of discussion, we will refer to the first challenged practice as a "religiously required test," and the second as a "clergy verification requirement."

## A. Religious Exercise

In considering whether Koger met his burden of establishing that his non-meat diet was a religious exercise, we first recall that under RLUIPA, "[t]he term 'religious exercise' includes any exercise of religion, whether or

not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Although RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, . . . [it] does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 n.13 (internal quotation and citation omitted). Because RLUIPA is a guarantor of sincerely held religious beliefs, it may not be invoked simply to protect any "way of life, however virtuous and admirable, . . . if it is based on purely secular considerations." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). For example, if Koger's desire for a non-meat diet was rooted solely in concerns for his bodily health, it would not be protected by RLUIPA.

The record before us indicates that from the time of his first request in May 2001, Koger stated that his desire for a non-meat diet was based on his religious beliefs and practices. At the time of this first request, Koger's beliefs were not affiliated with any organized religion. This in itself is not necessarily fatal to his claim. *See Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (holding that a person's religious beliefs "need not be based on . . . a mainstream faith," but rather should be the beliefs "dealing with issues of ultimate concern that for her occupy a place parallel to that filled by . . . God in traditionally religious persons") (citations and quotation omitted). However, we need not decide this issue based solely on Koger's initial unaffiliated request because by December 2001, he was asking for accommodation of his religious exercise as a member of OTO. Along with this second request, he submitted paperwork from OTO stating that, while his new religion had no general dietary restrictions, "each individual Thelemite may, from time to

time, include dietary restrictions as part of his or her personal regimen of spiritual discipline." This document brings Koger's dietary request squarely within the definition of religious exercise set forth by RLUIPA. *See* 42 U.S.C. § 2000cc-5(7)(A). In fact, this portion of Greenfield's letter can be accurately restated using the statutory definition, i.e., while there are no dietary restrictions "compelled by" or "central to" OTO, many of its practitioners adopt such restrictions as part of their "exercise" of Thelema. We therefore conclude that Koger sought to refrain from eating meat as a religious exercise as that term is defined by RLUIPA.

Additionally, the duration of time over which Koger sought to have his dietary request accommodated, and the fact that he sought that accommodation primarily as an OTO member, clearly demonstrates that his beliefs were sincerely held. If Koger's beliefs were not sincere, and if he wanted a non-meat diet for reasons other than his religious beliefs, he could have attempted to have his affiliation changed to one of the denominations whose members regularly received non-meat diets. The fact that he did not, settling instead on a religion with which the prison officials were unfamiliar, indicates that Koger's beliefs, in addition to being religious in nature, were sincerely held. While Koger bears the burden on this point, it is worth noting that the prison officials introduced no evidence from which a fact finder could conclude that Koger's desire for a non-meat diet was the result of anything other than a sincerely held religious belief, such as conduct inconsistent with that belief. Based on the record before us, and the definition of "religious exercise" provided by RLUIPA, we conclude that, in requesting a non-meat diet, Koger was asking for ac-

commodation of a religious exercise rooted in sincerely held beliefs.

### B.  The Religiously Required Test

The prison officials defend the religiously required test solely by arguing that Koger did not meet his burden of showing that the request was based on sincerely held religious beliefs. Having concluded that sincerely held religious beliefs prompted Koger's request, we further conclude that to the extent the prison officials' denials of Koger's requests were based on the religiously required test, they unlawfully restricted Koger's religious exercise. The substantial burden was manifest—Koger repeatedly provided documentation to prison officials stating that OTO does not impose dietary restriction on all of its members, but that such restrictions are practiced by some. Koger's requests made clear that he was among the members choosing to practice the restrictions. To have his request accommodated, however, the prison officials would have required him to establish exactly what RLUIPA does not require—that his requested diet was "compelled by" or "central to" his faith. 42 U.S.C. § 2000cc-5(7)(A). Additionally, the prison officials have not offered evidence that the religiously required test was employed in furtherance of a compelling governmental interest, or the least restrictive means of furthering that interest. Accordingly, we conclude that it was a violation of RLUIPA for the prison officials to deny Koger's request for a non-meat diet simply because OTO has no general dietary restrictions.

## C. The Clergy Verification Requirement

Unlike the religiously required test, the clergy verification requirement does not clearly violate the express provisions of RLUIPA, and therefore requires a more extensive weighing of the record under RLUIPA's analytical framework. To determine whether Koger met his burden of showing that the clergy verification requirement substantially burdened his religious exercise, we must first determine the meaning of "substantial burden" in the context of RLUIPA. When considering a similar provision of the Religious Freedom Restoration Act ("RFRA") which prohibits the government from "substantially burden[ing] a person's exercise of religion," 42 U.S.C. § 2000bb-1(a), we held that "a substantial burden on the free exercise of religion . . . is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs." *Mack v. O'Leary*, 80 F. 3d 1175, 1179 (7th Cir. 1996), *vacated by Mack v. O'Leary*, 522 U.S. 801 (1997) (vacating the circuit court decision and remanding for further proceedings in light of *City of Boerne v. Flores*, 521 U.S. 507 (1997)).[6]

---

[6] The RFRA, enacted in 1993, provides similar protections to those afforded in RLUIPA, however it was intended to apply to "all Federal and State law," 107 Stat. 1488, 1489 (1993), and was enacted pursuant Congress's enforcement power under Section 5 of the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 516-17. Finding that the RFRA exceeded Congress's enforcement power under Section 5, the Supreme Court invali-

(continued...)

When Congress enacted RLUIPA, it included the broad definition of religious exercise stated above, 42 U.S.C. § 2000cc-5(7)(A), which was not part of the RFRA. This inclusion prompted a renewed consideration of what constitutes a substantial burden. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760-61 (7th Cir. 2003). Accordingly, in 2003 we held that "in the context of RLUIPA's broad definition of religious exercise, a . . . regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Id.* at 761. In determining when an exercise has become "effectively impracticable," it is helpful to remember that in the context of the Free Exercise Clause, the Supreme Court held that a government imposes a substantial burden on a person's beliefs when it "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981); *see also Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (recognizing that a prisoner can bring a claim where he is "put to an improper choice between adequate nutrition and observance of the tenets of his faith").

We conclude that the prison officials' clergy verification requirement was responsible for rendering Koger's religious exercise effectively impracticable. We have long held that "[t]he rights of inmates belonging to minority or

---

[6] (...continued)
dated it as an enforcement vehicle against the states. *Id.*, at 532-36. Congress responded by enacting RLUIPA in 2000, "invoking federal authority under the Spending and Commerce Clauses . . . ." *Cutter*, 544 U.S. at 715.

non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations." *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991). Here, Koger's religion lacks clergy members as traditionally understood, or who fit Bryan's description of "Rabbi-Imam, etc." Instead, the record indicates that OTO has a handful of officers, most of whom promote and carry out the group's administrative affairs. More important, however, there are no universal requirements that could even be verified by these leaders, at least when it comes to dietary restrictions. A clergy verification requirement therefore renders impracticable religious exercise by members of OTO, or other religions without traditional clergy or universal requirements. *See, e.g.*, *Kaufman*, 419 F.3d at 681-82 (holding that atheism can, in the "specialized sense" of applying First Amendment protections, be considered a religion).

Furthermore, even if Koger belonged to a religion with traditional clergy and uniform practices, a clergy verification requirement forms an attenuated facet of any religious accommodation regime because clergy opinion has generally been deemed insufficient to override a prisoner's sincerely held religious belief. *See, e.g., Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (holding that the role the Eid ul Fitr feast played in a prisoner's practice of Islam was determinative of whether there had been a substantial burden, and not the testimony of Muslim clerics as to the proper celebration of the feast); *Jackson v. Mann*, 196 F.3d 316, 320-21 (2d Cir. 1999) (holding that it was the sincerity of a prisoner's beliefs, and not the decision of Jewish religious authorities, that determined whether the prisoner was an adherent of Judaism entitled to a kosher meal); *see also Frazee v. Ill. Dep't of*

*Employment Sec.*, 489 U.S. 829, 834 (1989) (holding that in the context of a denial of unemployment benefits, the plaintiff's refusal, based on his Christianity, to work on Sundays was entitled to protection even though "there are assorted Christian denominations that do not profess to be compelled by their religion to refuse Sunday work"). We therefore conclude that the prison officials' clergy verification requirement imposed a substantial burden on Koger's religious exercise.

Koger having established a prima facie case that the clergy verification requirement violated RLUIPA, we now consider whether the prison officials established that such a requirement is the least restrictive means of furthering a compelling governmental interest. Courts are to apply RLUIPA with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline . . . ." *Cutter*, 544 U.S. at 723 (citation omitted). Concerns of security are to be given "particular sensitivity." *Id.* at 722. The prison officials assert that good order requires that prisoners' religious affiliations be verified, and that the prison's dietary system be administered in an orderly fashion. Indeed, verification of religious affiliation has been held to serve legitimate penological interests. *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096-97 (2d Cir. 1997). Likewise, orderly administration of a prison dietary system, and the accommodations made thereunder, are legitimate concerns of prison officials. *See Resnick v. Adams*, 348 F.3d 763, 769 (9th Cir. 2003) ("The legitimate governmental interest at stake here is the orderly administration of a program that allows federal prisons to accommodate the religious dietary needs of thousands of prisoners.") (quotation

omitted); *see also DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) (agreeing with prison officials that "a simplified and efficient food service" is a legitimate penological interest). The problem for the prison officials, however, is that no appellate court has ever found these to be compelling interests.[7] Moreover, the governmental interest should be considered in light of the prisoner's request and circumstances at the detention facility. *See Hunafa*, 907 F.2d at 47-48. Koger's request must therefore be considered in light of the fact that the prison already served two diets that would have satisfied his request. It must also be considered in light of the fact that Koger ultimately supplied to prison officials, among other things, the letter from Greenfield, the letter from OTO's treasurer stating that Koger was a dues-paying member, and information setting forth OTO's beliefs and practices including that some members practice dietary restrictions. The prison officials failed to show what effort would have been involved in providing a meatless diet to Koger, how this would have hampered prison administration, or how the clergy verification furthered any interest not already satisfied by Koger's submissions. We can only give deference to the positions of prison officials as required by *Cutter*, 544 U.S. at 723, when the officials have set forth those positions and entered them

---

[7] In the proceedings below, the prison officials cited *Jenkins v. Angelone*, 948 F. Supp. 543, 547 (E.D. Va. 1996), for the proposition that management of a prison dietary department and its impact on the nutritional needs of inmates are compelling government interests. The prison officials do not cite *Jenkins* on appeal, and we therefore do not consider it other than to note that the district court therein cited no authority for its findings that the above interests are compelling.

into the record. *See Lovelace*, 472 F.3d at 191 (concluding that prison officials had failed to meet their burden under RLUIPA because they had not submitted sworn statements establishing how the challenged practices furthered any compelling interest). We therefore conclude that the prison officials failed to meet their burden in showing that the clergy verification requirement furthered a compelling governmental interest.

Even if the prison officials' asserted interests were deemed to be compelling, they do not support their assertion that a clergy verification requirement was the least restrictive means of achieving these ends. One less restrictive means would have been to simply comply, at least in part, with the Illinois Administrative Code which requires only that a prisoner provide "written verification" in order to receive a religious-based dietary accommodation, with no requirement that the verification be from a clergy member. 20 Ill. Adm. Code. § 425.70(c). When a prisoner provides his own written verification, prison officials are still entitled to the benefit of the long-standing requirement that a prisoner provide sufficient indicia that his request is borne of a sincerely held religious belief. Moreover, the Illinois Administrative Code provides a further check against abuse when it provides that "[a] committed person who does not adhere to the alternative diet shall no longer receive the alternative diet . . . ." 20 Ill. Adm. Code. § 425.70(e). Likewise, the federal prison system requires prisoners seeking dietary accommodations to "provide a written statement articulating the religious motivation for participation in the [religious dietary accommodation program]." *Resnick*, 348 F.3d at 765 (citing 28 C.F.R. § 548.20(a)). Having prisoners verify in writing that their dietary

request is religious-based is just one example of a less restrictive means by which the prison officials could have furthered the interests of orderly administration and verification. One less restrictive means, however, is sufficient for us to conclude that the prison officials failed to meet their burden that they were employing the least restrictive means of furthering compelling governmental interests.

Summing up, we conclude that Koger met his burden of establishing that both the religiously required test and the clergy verification requirement operated as substantial burdens on his religious exercise. The prison officials failed to meet their burden in showing that their practices were the least restrictive means of furthering a compelling government interest. Accordingly, the record establishes that the practices challenged by Koger violated RLUIPA, and judgment in his favor on this claim is warranted. The district court erred in entering summary judgment in favor of the prison officials on Koger's RLUIPA claim.

D.  Koger's Constitutional Claims and Motion to Compel

Having concluded that the defendants' conduct violated RLUIPA, we call to mind the principle that "federal courts are supposed to do what they can to avoid making constitutional decisions, and strive doubly to avoid making unnecessary constitutional decisions." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001); *see also Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (declining to consider a prisoner's constitutional claims, and considering solely his RLUIPA claim after noting the heightened protections it offers).

Because the prison officials are liable under RLUIPA for the conduct complained of in the constitutional claims, we decline to consider those latter claims. Additionally, we need not consider Koger's challenge to the district court's denial of his motion to compel because the additional evidence sought by Koger is unnecessary to his RLUIPA claim—that claim succeeds based on the record as it stands. The discovery sought would therefore only be material, if at all, to his constitutional claims, which we are not reviewing.

## E.  Qualified Immunity

Koger's success on his RLUIPA arguments will not result in damages if the prison officials are protected by qualified immunity, and so we turn to their argument that they are so protected. "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (emphasis in original) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A plaintiff seeking to defeat an assertion of qualified immunity must establish "that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred." *Id.* Moreover, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This is not to say that an official will always be shielded by immunity unless the challenged practice has previously been deemed unlawful; rather "in the

light of pre-existing law the unlawfulness must be apparent." *Id.*

RLUIPA was enacted on September 22, 2000. Pub. L. No. 106-274 §§ 2-6, 8, 114 Stat. 803-06. Koger filed his requests for a non-meat diet in May 2001, December 2001, and April 2002. His internal grievance was filed in January 2002. Because of the dearth of cases dealing with RLUIPA during this period, Koger must show that RLUIPA itself, or principles established in other contexts and applicable to RLUIPA, established the contours of his rights so that a reasonable official could have easily discerned them. There are numerous reasons leading us to conclude that the rights protected by RLUIPA, and violated by the prison officials as set forth above, were clearly established during the period the prison officials denied Koger's dietary requests. First, RLUIPA did not announce a right having broad application across many segments of society. Rather, it prohibited substantially burdening religious exercise in only two contexts: by land use regulation, 42 U.S.C. § 2000cc, or while a person is imprisoned. 42 U.S.C. § 2000cc-1. Moreover, RLUIPA did not announce a new standard, but shored up protections Congress had been attempting to provide since 1993 by means of the RFRA, and which had seen frequent litigation in the prison context. *See, e.g., Craddick v. Duckworth*, 113 F.3d 83, 85 (7th Cir. 1997) (applying the standard shared by the RFRA and RLUIPA and concluding that a prohibition against wearing medicine bags violated the RFRA).

Aside from the fact that RLUIPA employs a standard already contained in the RFRA, it is noteworthy that the components of its analysis have been used in constitutional litigation for some time. For example, the difficult

burden laid on a defendant who must show that its conduct was the "least restrictive means of achieving some compelling state interest" has been established for decades. *See Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). Similarly, the prohibition against substantially burdening sincerely held religious beliefs is well-established in Free Exercise Clause cases. *See, e.g., Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice . . . ."). RLUIPA has a broader scope of protection than "central religious beliefs or practices," but Congress cleared up any resulting ambiguity by expressly setting forth what is included within that broader protective scope—"any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

While the case will undoubtedly arise where a plaintiff asserts a right only questionably covered by RLUIPA, Koger asserted the right to religious accommodation for a religious practice demonstrably associated with, though not compelled by, his religion. The prison officials violated this clearly established right because they required *exactly* what RLUIPA provides they cannot—a religious practice compelled by OTO. Likewise, in requiring clergy verification, the prison officials employed a clergy-as-arbiter-of-orthodoxy standard that had long been rejected. *See Frazee*, 489 U.S. at 834 (rejecting "the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization"and holding that the believer's sincerity is the appropriate consideration); *Jackson*, 196 F.3d at 320 (rejecting a prison's policy of

deferring to Jewish authorities on the question of whether an inmate is Jewish for the purposes of providing a kosher meal, and directing the prison officials to consider the sincerity of the inmate's beliefs). Finally, we note that the only other circuit court to have considered this issue held that "[a]lthough the outer boundaries of RLUIPA may have been uncharted at the time [of the defendant's conduct], its core protections were not." *Lovelace*, 472 F.3d at 198 (reversing a grant of qualified immunity where the district court found that RLUIPA's constitutionality was not clearly established because its constitutionality was presumed when it took effect). Accordingly, Koger's right not to be subjected to a religiously required test or a clergy verification requirement was clearly established when the prison officials employed both. Those rights being clearly established at the relevant time, we conclude that the prison officials are not entitled to qualified immunity.

## F. Service by United States Marshal

Koger's final argument on appeal is that the district court erred in denying his motions for service by a United States marshal simply because he paid the filing fee instead of proceeding in forma pauperis. Federal Rule of Civil Procedure 4 provides that "[a]t the plaintiff's request, the court may order that service be made by a United States marshal or deputy marshal or by a person specially appointed by the court. The court must so order if the plaintiff is authorized to proceed in forma pauperis under 28 U.S.C. § 1915 . . . . " Fed. R. Civ. P. 4(c)(3). The district court misapplied Rule 4 because it failed to exercise the discretion given it when the plaintiff pays the filing fee. *See* Fed. R. Civ. P. 4 advisory committee's note

(1993) ("The court . . . retains discretion to appoint a process server on motion of a party."). Because these denials resulted from its mistaken belief that service by a marshal was unavailable to a party who paid the filing fee, the district court abused the discretion afforded it by Rule 4. *Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.") On remand, the district court should exercise its discretion to discern whether service should be made upon Bryan and Schomig pursuant to Rule 4(c)(3).

## G. Additional Considerations

In reversing the district court's grant of summary judgment for the prison officials on Koger's RLUIPA claim, and directing the entry of judgment for Koger on that claim, we note a few final points to be kept in mind by the district court. First, although Koger sought declaratory and injunctive relief, as well as compensatory and punitive damages in his Amended Complaint, his request for injunctive relief has been rendered moot by his release from prison. *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) ("In an action seeking only injunctive relief . . . once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot. If, however, a plaintiff also seeks monetary damages, his case is not moot even if the underlying misconduct that caused the injury has ceased.") (citations omitted). Next, RLUIPA provides that a cause of action may be asserted thereunder to obtain "appropriate relief." 42 U.S.C. § 2000cc-2(a). However, because the relief herein is being sought by a former prisoner, the Prisoner Litigation

Reform Act ("PLRA") is applicable.[8] In particular, Koger's suit is limited by the provision of the PLRA that provides "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). We have previously held that this provision limits the damages available to prisoners not only for constitutional torts, but for violations of federal statutes. *Cassidy v. Ind. Dep't of Corr.*, 199 F.3d 374, 376-377 (7th Cir. 2000); *see also Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007) (holding that the PLRA limits the availability of compensatory and punitive damages under RLUIPA, but leaving open the availability of nominal damages).

## III.

We conclude that the record establishes that the prison officials violated Koger's rights as secured under RLUIPA, and that judgment in Koger's favor on his claim brought under that statute is warranted. Having reached this conclusion, we do not consider Koger's constitutional claims. Additionally, the district court abused its discretion in failing to exercise the discretion available to it under Fed. R. Civ. P. 4. Accordingly, we REVERSE the district court's grant of summary judgment in favor of the prison

---

[8] We have held that the question of whether a former prisoner's claim is governed by the PLRA is determined by "look[ing] to the status of the plaintiff at the time he brings his suit." *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004). Koger filed suit on May 1, 2002, and was released from prison on December 11, 2006. His claims are therefore governed by the PLRA.

officials on Koger's RLUIPA claims, as well as its denials of Koger's motions for service by a United States marshal, and REMAND for proceedings consistent with this opinion.

EVANS, *Circuit Judge*, concurring. I join Judge Manion's fine opinion without any reservations. It touches all the bases that must be touched and reaches a conclusion with which I agree. I write separately, however, to note that I can't help but feel what has happened here is pretty close to a waste of time for all concerned.

Start with the State of Illinois. Inmates in its prisons must be fed, and the vast majority of them receive a standardized meal—which I assume is an offering of reasonably healthy food. The prison does, however, offer three "religious" diets:  kosher, vegan, and lacto-ovo vegetarian.[1] Why, I wonder, when Koger asked for either a vegan or a lacto-ovo vegetarian diet, did the State go to the mattresses and fight his request all the way up to a court of appeals in the federal judicial system? Even if the

---

[1]  A lacto-ovo vegetarian is a vegetarian who does not eat beef, pork, poultry, fish, shellfish, or animal flesh of any kind but is willing to consume cheese, butter, yogurt, and eggs (*Lacto-* means "milk" and *ovo* means "egg"). Most vegetarians are lacto-ovo vegetarians. Generally, when one uses the term "vegetarian," a lacto-ovo vegetarian is assumed. A vegan, on the other hand, consumes no animal products at all.

prison officials doubted the sincerity of Koger's "religious beliefs," why make a federal case out of it? Certainly if an inmate wanted to opt for a vegetarian diet, a rule that would require him to stick with it for a year before changing his mind again would seem to be quite reasonable. But what the State did here, digging in its heels and saying no, seems quite unreasonable to me.

My other concern is with RLUIPA itself, a law that has been on the books since 2000. Clearly, without RLUIPA, this case would have been dead in the water when it was filed because declining Koger's request for a nonmeat diet would not have violated the United States Constitution. It was well-settled, before RLUIPA, that a neutral law or rule of general applicability was not required to be justified by a compelling state interest even if it had the incidental effect of burdening a particular religious practice. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). So, but for RLUIPA, this litigation, which has been going on now for almost six years, would have died long ago.

RLUIPA, I submit, fosters the potential for mischief and game-playing. Koger's case is, potentially at least, a pretty good example of that. Koger arrived in the custody of the Illinois Department of Corrections in 1996 to begin serving a 19-year sentence following a conviction for armed violence. Upon entering the prison system, he said he was a Baptist. A couple of years later he said he was a Buddhist. Two years after that he said he was a member of "Ordo Templi Orientis ("OTO"), a group

associated with the religion of Thelema.[2] As Judge Manion notes, the central tenet of this religion is "Do what thou wilt" (for me, that's a tough one to figure out!), which urges its followers to consider the tenet to be "a divine mandate to discover their true purpose in life." Mr. Koger[3] is obviously a very bright guy and an accomplished writer—a visit to his blog at gregorykoger.com makes that pretty clear. But was his request for a nonmeat diet a mere preference (he practiced yoga) or the result of a sincerely held religious belief? On this record, we have no reason to doubt that it was the latter. But one would not be terribly surprised if Mr. Koger has had a beef tenderloin or a Big Mac since he left the prison a little over two years ago.

Finally, the bottom line to our decision, although decidedly correct, points out why this case is a bit of a waste of time. Because Mr. Koger is out of prison—and has been since December of 2006—his request for injunctive relief is moot. And because he was in prison when the case arose, he must proceed under the Prisoner Litigation Reform Act, which takes compensatory and punitive damages off the table as he suffered no "physical injury" but only, at best, a "mental or emotional injury." And that limits his recovery to nominal damages.

---

[2] The letter from T. Allen Greenfield, quoted in our opinion, to the effect that "Thelema imposes no general dietary restrictions" is interesting, as is Mr. Greenfield himself. According to his entry at wikipedia.org, Greenfield is "an avid speaker on subjects related to UFOs and the occult."

[3] Koger was paroled in December of 2006 after serving more than 10 years of his sentence.

So when all is said and done, the State of Illinois has spent a lot of money defending this case for six years. Koger may end up with a dollar, and his lawyer, Jeffrey L. Oldham, who by the way has done an outstanding job, will get a limited amount of attorney's fees. A waste of time? Some may disagree, but I lean towards saying "yes."